# FOR PUBLICATION



FILED
Jul 19 2012, 8:56 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**ROBERT D. KING, JR.**
**DAVID R. THOMPSON**
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**BETH A. DALE**
Office of Corporation Counsel
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| DAVID DANIEL JOHNSON, JR., <br> By Next Friend, INDIANA DEPARTMENT <br> OF CHILD SERVICES, <br><br>     Appellant-Plaintiff, <br><br>         vs. <br><br> THE MARION COUNTY CORONER'S <br> OFFICE and CITY OF INDIANAPOLIS, <br><br>     Appellees-Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   No. 49A02-1111-CT-1070 <br> ) <br> ) <br> ) <br> ) <br> ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Timothy W. Oakes, Judge
Cause No. 49D13-1003-CT-9468

**July 19, 2012**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Plaintiff, D.J., Jr., by next friend the Indiana Department of Child Services (D.J.), appeals the trial court's grant of summary judgment in favor of Appellees-Defendants, the Marion County Coroner's Office (the Coroner's Office) and the City of Indianapolis (the City) (collectively, the Appellees), with respect to D.J.'s claim for negligent and intentional infliction of emotional distress resulting from the removal of his mother's remains.

We affirm in part, reverse in part, and remand for further proceedings.

## ISSUES

D.J. raises three issues on appeal, which we restate as:

(1) Whether the trial court correctly held, as a matter of law, that the Coroner's Office is entitled to the law enforcement immunity pursuant to the Indiana Tort Claims Act;

(2) Whether summary judgment was appropriate with respect to D.J.'s claim for damages for negligent infliction of emotional distress arising out of the removal of his deceased mother's remains; and

(3) Whether summary judgment was appropriate with respect to D.J.'s claim for damages for intentional infliction of emotional distress because the Appellees' conduct was extreme and outrageous.

## FACTS AND PROCEDURAL HISTORY

In May of 2009, thirteen-year-old D.J was living in an apartment in Indianapolis, Indiana, together with his mother, Teresa Smith (Smith), and his biological father, David

2

Johnson, Sr. (Johnson). Smith and Johnson had never married. The last three to four years, Smith had been bedridden due to her weight and D.J. helped take care of her.

On May 19, 2009, at approximately 6:30 a.m., Johnson woke up D.J. and asked him to call 911 because something was wrong with his mother. D.J. called 911 and told dispatch that his mother was asleep and would not wake up. While they waited for the paramedics to arrive, D.J. went into his mother's bedroom and saw her body. Shortly thereafter, Indianapolis Metropolitan Police Officer Randall Denny (Officer Denny) arrived at the apartment. Officer Denny checked Smith's vital signs and informed D.J. that his mother had died. Upset at hearing this news, D.J. walked out the apartment, told a neighbor that his mother had died, and then sat near the utility box on the sidewalk to cry. Officer Denny contacted the Coroner's Office with the request to send a deputy coroner to the apartment.

Deputy Coroner Steven Kelly (Kelly) responded. Kelly had been with the Coroner's Office for approximately one month and had not yet received any formal training. At the apartment, Kelly spoke with Johnson and the police officers who were present. He then went into Smith's bedroom. Given Smith's obesity, Kelly was unsure how to handle the situation. Three employees of Digger Mortuary Services, the Coroner's Office contractor handling the removal of a decedent's remains, arrived at the apartment. All three employees told Kelly that they did not have the equipment to transport Smith's remains to the Coroner's Office. Kelly contacted Michelle Willis (Willis), another Deputy Coroner, to get instructions. Willis was off duty at that time and she suggested that he contact the Chief Deputy Coroner Alfarena Ballew (Ballew).

Because Kelly did not have Ballew's direct phone number, he phoned the Coroner's office and spoke with the office secretary. After Kelly apprised the secretary of the situation, the secretary placed Kelly on hold while she relayed a message to Ballew, who was in a meeting. The secretary told Ballew that "there is a need to remove an extremely obese female from a scene, who is on a mattress." (Appellant's App. p. 114). Ballew requested some follow-up information. A while later, the secretary returned and informed Ballew that

> [t]he body was situated on a mattress, and the decedent was unable to be removed from the mattress, and that the removal service that [is normally contracted] [Digger Mortuary Services] did not have the appropriate equipment, cot and/or staff that could remove the decedent from the mattress, to any equipment that she could be transported from the scene to the Coroner's Office.

(Appellant's App. p. 115). The secretary then recalled a previous case where they had removed a decedent by using a towing service and asked Ballew if she wanted to use a tow truck. Ballew responded, "Well, I guess we can." (Appellant's App. p. 114). The secretary then called Zores Towing and instructed them to send a tow truck to the apartment.

After Kelly informed the police officers present that a tow truck was coming to transport Smith's remains, a police officer contacted the Indianapolis Fire Department (IFD) for assistance. Upon arrival, the IFD started to drag Smith's body out of the apartment on her mattress, covered with a sheet as the Coroner's Office did not have any body bags that would fit. A maintenance crew of the apartment complex removed the back door of the apartment. D.J. saw men dragging his mother, on her mattress, through

4

the living room and out the door. Outside, sheets were held up around the mattress in an attempt to block pedestrians, who had gathered around, from watching the removal of Smith's remains. Smith's body was dragged to the apartment complex's courtyard, where the tow truck was parked. At Kelly's direction, workers winched Smith's body, secured on the mattress, onto the truck, pulled it up a ramp to the flat bed portion of the truck and then strapped it down. Once Smith's remains were lashed down on the tow truck, workers tossed a dirty carpet on her before her body was transported to the Coroner's Office. Later that day, Ballew received a phone call from Jason Stroup, the owner of Digger Mortuary Services, informing her that contrary to what Kelly was told at the apartment, Digger Mortuary Services did have the appropriate equipment to transport remains of obese individuals.

On March 2, 2010, D.J. and Johnson, individually and as D.J.'s next friend, filed their Complaint against Appellees seeking damages for negligent and intentional infliction of emotional distress for their removal and transportation of Smith's remains. On July 22, 2010, on motion by Appellees, the trial court dismissed the claims brought by Johnson in his individual capacity. On May 16, 2011, D.J. moved for leave to file an amended complaint to add facts and to substitute the Indiana Department of Child Services as his next friend.[1] The trial court granted D.J.'s motion. On July 13, 2011, Appellees filed a motion for summary judgment asserting (1) immunity under the Indiana Tort Claims Act and (2) the absence of any independent evidence indicating negligent or intentional infliction of emotional distress. On September 16, 2011, D.J. filed his reply to

---

[1] During the course of the proceedings, Johnson's parental rights to D.J. were terminated.

Appellees' motion for summary judgment. On October 24, 2011, the trial court conducted a hearing on the motion. Four days later, on October 28, 2011, the trial court granted Appellees' motion, summarily ordering the dismissal of D.J.'s claims with prejudice.

D.J. now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id*. When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id*. Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id*.

6

We observe that in the present case, the trial court did not enter findings of fact and conclusions of law in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *Id*. However, such findings offer this court valuable insight into the trial court's rationale for its review and facilitate appellate review. *Id*.

## II. *The Indiana Tort Claims Act*

D.J. contends that the trial court improperly granted summary judgment to Appellees as it incorrectly determined that the Coroner's Office is immune to suit under the Indiana Tort Claims Act (ITCA).[2] D.J. maintains that because the transportation of Smith's remains did not amount to an enforcement of the statutory requirement that the Coroner's Office must investigate the cause of death of a person who has been found dead, the governmental agency's immunity did not come into play.

The ITCA was enacted after our supreme court in *Campbell v. State*, 284 N.E.2d 733 (Ind. 1972) severely reduced the scope of the common law doctrine of sovereign immunity. *See generally Peavler v. Bd. of Comm'rs of Monroe Co*., 528 N.E.2d 40 (Ind. 1988). In *Campbell*, our supreme court wrote that the arguments in favor of governmental immunity are "questions which properly belong to the legislature . . ." *Campbell*, 284 N.E.2d at 736. In response to this, in 1974 the General Assembly passed the ITCA which lists a number of governmental activities that are immunized from tort liability. *See King v. Northeast Security, Inc*., 790 N.E.2d 474, 478 (Ind. 2003).

---

[2] It should be noted that Appellees on appeal only argue immunity pursuant to ITCA for the Coroner's Office. Thus, even if we were to hold that the Coroner's Office is immune from suit, which we do not, the City was not acting pursuant to any statutory duty and is not entitled to immunity under ITCA.

As the ITCA is in derogation of the common law, we construe it narrowly against the grant of immunity. *Mullin v. Municipal City of South Bend*, 639 N.E.2d 278, 281 (Ind. 1994). The party seeking immunity has the burden of establishing that its conduct comes within the provisions of the ITCA. *Id*. Whether a particular governmental act is immune is a question of law for the court to decide, although the question may require extensive factual development. *Barnes v. Antich*, 700 N.E.2d 262, 265 (Ind. 1998), *trans. denied*.

At issue in the present case is what has been referred to as the "law enforcement immunity," codified at Indiana Code section 34-13-3-3(8) and which provides, in relevant part, as follows:

> A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following:
>
> * * *
>
> (8) The adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment.

The Coroner's Office now claims that Section 3(8) entitles it to immunity from the suit brought by D.J. as the alleged tort resulted from the enforcement of I.C. § 36-2-14-6. Indiana Code section 36-2-14-6 states, in pertinent part:

> **Investigation of death of person; certificate of death; autopsy**
> Whenever the coroner is notified that a person in the county:
> (1) has died from violence;
> (2) has died by casualty;
> (3) has died when apparently in good health;
> (4) has died in an apparently suspicious, unusual, or unnatural manner; or
> (5) has been found dead;

8

The coroner shall, before the scene of the death is disturbed, notify a law enforcement agency having jurisdiction in that area. The agency shall assist the coroner in conducting an investigation of how the person died and a medical investigation of the cause of death. The coroner may hold the remains of the decedent until the investigation of how the person died and the medical investigation of the cause of death are concluded.

The scope of immunity afforded by Section 3(8) has gone through much change since its enactment.[3] In *Seymour Nat'l Bank v. State*, 422 N.E.2d 1223, 1226 (Ind. 1981), *clarified upon reh'g*, 428 N.E.2d 203, our supreme court interpreted the scope of Section 3(8) for the first time and determined that governmental entities were immune for all acts of enforcement save false arrest and imprisonment. This holding was later explicitly extended to any governmental entity, not just law enforcement officers. *Ind. Dep't. of Correction v. Stagg*, 556 N.E.2d 1338, 1341 (Ind. Ct. App. 1990), *trans. denied*. Ten years later, the supreme court went a different direction with *Tittle v. Mahan*, 5821 N.E.2d 796 (Ind. 1991), a consolidated case of two separate appeals concerning two inmates who had killed themselves while in jail. Rejecting *Seymour*, the *Tittle* court concluded that the plain meaning of "enforcement of the law" excluded activities associated with the administration of pre-trial detainees at a county jail. *Id*. at 801. The court announced that activities included within the term "law enforcement" were limited to those activities attendant to effecting the arrest of those who may have broken the law. *Id*.

---

[3] For a comprehensive review of the Section's history, we refer to Judge Sullivan's excellent opinion in *St. Joseph Co. Police Dept. v. Shumaker*, 812 N.E.2d 1143 (Ind. Ct. App. 2004), *trans. denied*. For purposes of this opinion, we will condense our historical explanation.

9

However, two years later, in *Quakenbush v. Lackey*, 622 N.E.2d 1284 (Ind. 1993), our supreme court changed direction again. In *Quakenbush*, the supreme court granted transfer to decide that a police officer travelling to the scene of a crime was not immune from civil liability for driving negligently. *Id*. at 1290. In its opening paragraph, the court stated that it was abandoning the dicta of *Tittle* and was overruling *Seymour*. *Id*. at 1285-86. After evaluating Section 3(8), the *Quakenbush* court concluded that the section "applies to the decision of any governmental entity and its employees about whether to adopt or enforce any statute, rule, or regulation." *Id*. at 1287 n.3. Although this seemingly broadened the definition of enforcement beyond that used in *Tittle*, the court also limited the availability of law enforcement immunity by employment of the public-private distinction. *Id*. at 1291. Most notably, the court stated that the dichotomy of the public-private test—in which the government and its employees are subject to liability for the breach of private duties owed to individuals, but are immune from liabilities for the breach of public duties owed to the public at large—comported with the Legislature's intent in passing the ITCA. *Id*. at 1290-91. Under such analysis, the court determined that the officer's conduct of driving in a negligent manner amounted to a private duty, which did not fall within the province of the ITCA. *Id*.

The following year, our supreme court further clarified its *Quakenbush* decision in *Mullin v. Mun. City of South Bend*, 639 N.E.2d 278 (Ind. 1994). In *Mullin*, the city dispatcher failed to send an ambulance to the scene of a house fire despite warnings that people may have been in the house. *Id*. at 280. This failure was contrary to a departmental notice governing when ambulances were to be dispatched. *Id*. The *Mullin*

10

court reasoned that "following governmental policy is not the same as enforcing it, at least in the context of the [ITCA]." *Id*. at 283. As such, the court concluded that "the scope of enforcement is limited to those activities in which a governmental entity or its employees compel or attempt to compel the obedience of another to laws, rules, or regulations, or sanction or attempt to sanction a violation thereof." *Id*. Applying this interpretation to the facts, the *Mullin* court concluded that the city was not compelling obedience of another to its rules and held that the city owed no private duty to the victims of the fire. *Id*. at 285.

The public-private distinction, first proposed in *Quackenbush*, was abandoned in *Benton v. City of Oakland City*, 721 N.E.2d 224 (Ind. 1999) and other cases decided since *Benton* have followed the definition of enforcement as used in *Mullin*. *See Shumaker*, 812 N.E.2d at 1148. More recently in *King v. Northeast Security, Inc*., 790 N.E.2d 474, 482 (Ind. 2003), our supreme court noted that in light of *Benton*, courts are free to interpret Section 3(8) without referring to the public-private duty test. The *King* court further held that the language of Section 3(8) restricts immunity to the adoption and enforcement of laws (and a failure to do so) which are within the assignment of the governmental entity and the legislature intended that a governmental entity be immune only for failing to adopt or enforce a law that falls within the scope of the entity's purpose or operational power. *Id*. at 483.

In *Shumaker*, we reconciled the divergent interpretations of Section 3(8) since the ITCA's inception and concluded:

11

that the enforcement spoken of which is now Section 3(8) of the ITCA means compelling or attempting to compel the obedience of another to laws, rules, or regulations, and the sanctioning or attempt to sanction a violation thereof. It would also, by the plain meaning of the statute, include the failure to do such. However, it does not include compliance with or following of laws, rules, or regulations by a governmental unit or its employees. Neither does it include failure to comply with such laws, rules, or regulations. Moreover, a governmental entity will be immune only for adopting or enforcing, or failure to adopt or enforce, a law, rule, or regulation within the scope of the entity's purpose or operational power.

*Shumaker*, 812 N.E.2d at 1150. Last year, our supreme court approved our understanding of Section 3(8) in *Davis v. Animal Control-City of Evansville*, 948 N.E.2d 1161 (2011). The *Davis* court reiterated that "the critical determination is not whether a governmental entity or employee failed to follow procedures; it is whether a governmental entity or employee failed to enforce a law." *Id.* at 1164.

We now turn to the task of applying this interpretation of Section 3(8) to the case at bar. D.J. contends that the trial court improperly granted immunity to the Coroner's Office because it was not enforcing compliance with I.C. § 36-2-14-6; rather, it was merely attempting to follow the statute when it transported Smith's remains to the Coroner's Office. Indiana Code section 36-2-14-6 requires the coroner to notify a law enforcement agency and to conduct an investigation into the cause of death of the individual who was found dead. It also allows the coroner to hold the remains of the decedent until the medical investigation is concluded. The statute is silent with regard to the transportation of the decedent's remains. Without deciding today whether the statute is applicable on the transportation of a decedent's remains, we conclude that, based on the facts before us, the Coroner's Office is not immune under ITCA.

12

In *Mullin*, the plaintiff sued the City of South Bend when an emergency dispatcher failed to send an ambulance to a house fire despite a department policy stating that medics would be dispatched to all fire calls where someone was thought to be inside. *Mullin*, 639 N.E.2d at 280. South Bend claimed statutory immunity under the law enforcement provision, claiming the policy of sending ambulances only to occupied house fires is a rule or regulation within the meaning of the statute and therefore, if the dispatcher failed to follow that policy, that was a failure to enforce a rule or regulation. *Id*. Our supreme court noted that "following governmental policy is not the same as enforcing it, at least in the context of the [ITCA]." *Id*. at 283. Because South Bend was neither compelling nor attempting to compel obedience of another to its rule or regulation nor sanctioning or attempting to sanction a violation thereof, it was not engaged in the enforcement within the meaning of the statute and had no statutory immunity. *Id*.

We are faced with a similar situation here. In order to pursue the directives of the statute and to complete a medical investigation into the cause of Smith's death after she was found dead at home, Kelly had to transport her remains to the Coroner's Office. To that end, a tow truck was summoned and her remains were winched onto the flat bed of the truck. By transporting the decedent to the Coroner's Office, Kelly was not compelling enforcement of the law against another person, he was merely following the law to enable a more detailed investigation. The Coroner's office conduct in following its own rules does not fall within the definition of enforcement for purposes of immunity

under ITCA. Consequently, we reverse the trial court's grant of immunity to the Coroner's Office.[4]

### III. *Negligent Infliction of Emotional Distress*

Relying on the bystander rule established in *Groves v. Taylor*, 729 N.E.2d 569 (Ind. 2000), D.J. contends that there is a genuine issue of material fact whether he is entitled to damages for negligent infliction of emotional distress resulting from the trauma he experienced in witnessing the Appellees "defile his mother's remains." (Appellant's Br. p. 11). Therefore, he maintains that the trial court erred when it granted summary judgment to the Appellees.

Traditionally, Indiana courts analyzed claims for negligent infliction of emotional distress under the impact rule, which required a physical injury caused by an impact to the plaintiff. *See Ryan v. Brown*, 827 N.E.2d 112, 119 (Ind. Ct. App. 2005). The underlying rationale for Indiana's impact rule was that "absent physical injury, mental anguish is speculative, subject to exaggeration, likely to lead to fictitious claims, and often so unforeseeable that there is no rational basis for rewarding damages." *Cullison v. Medley*, 570 N.E.2d 27, 29 (Ind. 1991). In *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991), however, our supreme court modified the impact rule, holding that when:

> A plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person[,] . . . such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

---

[4] Because the Coroner's Office did not advance a claim of governmental immunity pursuant to common law, we will not analyze the cause under common law immunity.

However, following *Shuamber*, courts continued to interpret the modified impact rule as requiring a direct physical impact.  *See, e.g., Lachenman*, 838 N.E.2d at 457.

On June 7, 2000, our supreme court signaled a new significant development in the law of negligent infliction of emotional distress when it decided *Groves v. Taylor*, 729 N.E. 2d 569 (Ind. 2000) in which the court retreated from the physical impact requirement by adopting the bystander rule where recovery is based on direct involvement with the accident.  In *Groves*, the court held that:

> Where the direct impact test is not met, a bystander may nevertheless establish direct involvement by proving that the plaintiff actually witnessed or came on the scene soon after the death or severe injury of a loved one with a relationship to the plaintiff analogous to a spouse, parent, grandparent, child, or sibling caused by the defendant's negligent or otherwise tortious conduct.

*Id*. at 573.  The *Groves'* holding recognizes that the emotional claim does not arise from the death or severe injury of another, but rather from the direct involvement of the individual bringing the claim in the event which has caused the emotional distress.  In other words, the claim is not based upon harm suffered by another; it is based upon harm which is personal to the individual bringing the claim.

Although the facts in the instant case appear unique at first glance, we have previously been called upon in two different instances to decide claims for negligent infliction of emotional distress involving human remains, both cases reaching opposite outcomes.  In *Blackwell v. Dykes Funeral Homes, Inc*., 771 N.E.2d 692, 694 (Ind. Ct. App. 2002), the Blackwells were the parents of a young man who committed suicide in 1987.  They had their son's body cremated and directed a funeral home to arrange for the

15

transportation of the urn containing his ashes to a glass niche in a cemetery chapel. *Id.* Twelve years after it was placed in the niche, the mother asked the chapel to move the urn closer to the glass so that she could have a better view. *Id.* However, several days later the vice-president of the company that owned the chapel informed the Blackwells that his employees had discovered that the urn was empty. *Id.* After receiving this information, the Blackwells brought claims for, *inter alia*, negligent infliction of emotional distress against both the funeral home and the cemetery. *Id.*

On appeal, we noted that the Blackwells sought emotional damages under *Groves* as bystanders. We pointed out that although *Groves'* bystander rule may be inapposite, the supreme court's reasoning in *Groves* was still persuasive and compelling. *Id.* at 697. We stated that "while there was no physical impact, the Blackwells have alleged serious emotional trauma and it is of a kind that a reasonable person would experience." *Id.* We clarified that:

> [i]n our view, this is the type of claim that our supreme court spoke of in *Groves*, where the plaintiff is sufficiently and directly involved in the incident giving rise to the emotional trauma. The rationale underlying the impact rule that prevents concocted claims of mental anguish is not implicated here. We are satisfied that the evidence designated to the trial court in this case is such that the alleged mental anguish suffered by the Blackwells is not likely speculative, exaggerated, fictitious, or foreseeable.

*Id.* We determined that, provided the Blackwells could prevail on their negligence claim, there was no reason why they should not be allowed to claim damages for emotional distress. *Id.* Therefore, we reversed the trial court in denying the Blackwells' claim. *Id.*

Just recently, we decided *York v. Fredrick*, 947 N.E.2d 969, 972 (Ind. Ct. App. 2011), *trans. denied*, where the decedent's daughter and grandchildren filed a claim for

16

negligent infliction of emotional distress against Fredrick, the funeral home, who directed the funeral arrangements. Following the funeral and graveside service, the family left the cemetery, leaving the internment of the remains in the hands of Fredrick. *Id.* When the funeral home lowered the casket into the vault, it was discovered that the casket was too large and would not fit. *Id.* Employees of the funeral home applied pressure to the corners of the casket. *Id.* Once the casket was in the vault, the vault was bulging and a seal was difficult to obtain. *Id.* Ultimately, the vault was interred without being completely sealed. *Id.* Approximately two weeks later, the Yorks were notified by an anonymous caller that there had been a problem during the interment of their relative and they obtained an exhumation of the remains. *Id.* The Yorks were present at the exhumation and although they did notice damage to the casket and vault, they did not see any damage to the decedent's remains. *Id.* At the Yorks' request, a video recording and photographs were taken for the exhumation process, vault, casket, and remains. *Id.* The photographs were stored on a laptop which was taken to a York family reunion, and set up to play the photographs in a slideshow for other family members to view. *Id.*

In their argument, the Yorks alleged that "the bystander rule was expanded by this court in [*Blackwell*] and the facts of this case squarely fit within this expansion." *Id*. at 973. We disagreed and found the situation in *York* to be readily distinguishable from *Blackwell*. *Id* at 975. Referencing *Blackwell*, we noted that:

> [t]hat case involved a truly egregious situation where the funeral home permanently lost the remains of the son of the plaintiffs, who had been directly involved with the funeral arrangements, and which loss was not discovered for over eleven years. . . . The upset experienced by the Yorks upon learning that [their relative's] casket and vault had been damaged

17

during burial does not rise to the same level of egregiousness as the situation in *Blackwell*. As all of the Yorks testified, the remains were not lost and there was no damage to [the decedent's] remains. Further, as previously stated, they were not present during the burial, and they voluntarily exposed themselves to the exhumation by either being present when it occurred or by later viewing pictures and video taken when it occurred.

*Id.*

Here, D.J. does not claim any sort of physical injury from the incident that gave rise to the suit. Rather, his claim is based on his emotional distress regarding the Coroner's Office handling of his mother's remains. As such, this cause squarely falls within the *Groves* line of cases that use the bystander test. Turning to the facts before us, we find the nature of the circumstances faced by D.J. to be closer to *York* than to *Blackwell* and we conclude that the evidence designated to the trial court in this case establishes that D.J. was not sufficiently and directly involved in the removal of his mother's remains by the Coroner's Office.

On May 19, 2009, thirteen-year-old D.J. was informed that his mother, whom he had helped take care of for the past four years, had died. He saw his mother's body in her bedroom before leaving the apartment. When D.J. returned, the IFD had arrived to render assistance in the transportation of Smith's remains. They started to drag Smith's body out of the apartment on her mattress, covered with only a sheet as her remains did not fit in a body bag. D.J. "saw them bringing her into the hallway." (Appellant's App. p. 58). D.J. noticed that "[t]hey took her out on her bed . . .[,] dragging the bed out" and then his father told him to go over to the neighbor's apartment. (Appellant's App. p. 60). While D.J. was at the neighbor's house, he tried to take a peek out of the window and

18

saw "that she was on some – I thought it was like a back of a truck or something." (Appellant's App. p. 61). In his deposition, he clarified "I just saw a truck. I thought they were bringing her out onto the truck, but I didn't know what they were doing." (Appellant's App. p. 62). D.J. later learned on CNN News that his inference that they transported his mother's remains on a flat bed truck was correct.

We conclude that these circumstances fall within the *York* rationale because D.J. did not witness any disturbing facts at the time the acts occurred and any exposure which did occur took place later as the result of D.J. voluntarily watching media reports. As to D.J.'s reaction when witnessing his mother's body initially being moved through the apartment, this reaction is more akin to that normally encountered by grieving relatives who witness the removal of their deceased loved ones. Moreover, D.J. witnessed his mother's body being moved on the bed only because he voluntarily exposed himself to these actions because he returned to the apartment after having left it upon the paramedics' arrival. Although the designated facts of this case may paint an egregious picture of an ill-advised transport of a decedent's remains by the Coroner's Office, the evidence does not show that D.J. was sufficiently and directly involved in the removal of his mother's body to justify a claim for negligent infliction of emotional distress. Therefore, we conclude that the trial court did not err when it granted summary judgment for the Appellees.

## IV. *Intentional Infliction of Emotional Distress*

Lastly, D.J. contends that the trial court erred by granting summary judgment to Appellees on his claim for damages for intentional infliction of emotional distress

19

because the conduct displayed by the Coroner's Office in the removal and transportation of Smith's body was extreme and outrageous and recklessly caused severe emotional distress to him.

The tort of intentional infliction of emotional distress was first recognized as a separate cause of action without the need for an accompanying tort in *Cullison v. Medley*, 570 N.E.2d 27 (Ind. 1991). In *Cullison*, our supreme court defined the tort of intentional infliction of emotional distress as: "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Id*. at 31. It is the intent to harm the plaintiff emotionally which constitutes the basis for the tort. *Id*. The elements of the tort are that the defendant (1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another. *Id*. The requirements to prove this tort are rigorous. *Id*. We have cited with approval the comment of Restatement (Second) of Torts § 46, cmt. D that:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or by a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*See, e.g., York*, 947 N.E.2d at 977; *Bradley v. Hall*, 720 N.E.2d 747, 752-53 (Ind. Ct. App. 1999). What constitutes extreme and outrageous conduct depends, in part, upon

prevailing cultural norms and values. *Bradley*, 720 N.E.2d at 753. Typically, intentional infliction of emotional distress is found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind. *Lachenman v. Stice*, 838 N.E.2d 451, 457 (Ind. Ct. App. 2005), *trans. denied*. In the appropriate case, the question can be decided as a matter of law. *Id*.

Construing the designated evidence in favor of D.J., and mindful of Kelly's denial of any intentional infliction of emotional distress to D.J., we find that there is a genuine issue of material fact whether the Appellees' conduct is so outrageous that it satisfies the reckless element of the tort. Faced with a difficult situation, Kelly requested advice from Ballew on how to transport Smith's remains. Although Ballew was informed of Smith's obesity and the fact that Digger Mortuary Services' employees had, albeit incorrectly, opined that they were not equipped to handle the remains, Ballew did not further investigate what other resources might be available. Rather, she followed the secretary's suggestion to call a tow truck. D.J.'s designated evidence reflects that the Coroner's Office had other resources at its disposal that could have been employed to transport Smith's remains in a more dignified manner.

The Coroner's Office dragged Smith's body outside on a mattress, only covered by a sheet. While an attempt was made to shield her remains from the gathering pedestrians when winching the mattress onto the truck's flatbed, designated evidence shows media footage of Smith's remains being moved onto the flat bed and covered by a dirty carpet. Interviewed witnesses expressed their indignation and outrage over the Coroner's Office treatment of Smith. "Today the print and electronic media openly

discuss bodily functions and dysfunctions as a matter of course, but these can be personal and private topics when they concern the health or physical condition of a particular individual." *Bradley*, 720 N.E.2d at 753. The Coroner's Office conduct may have been reckless, disrespectful, and offensive but reasonable persons may differ on whether this conduct reaches the level of extreme and outrageous necessary to satisfy the tort. Accordingly, as there is a genuine issue of material fact, Appellees were not entitled to summary judgment on D.J.'s claim for intentional infliction of emotional distress. We reverse the trial court and remand for further proceedings.

## CONCLUSION

Based on the foregoing, we conclude that (1) the Coroner's Office is not entitled to immunity under the ITCA; (2) summary judgment was appropriate with respect to D.J.'s claim for damages for negligent infliction of emotional distress; and (3) a genuine issue of material fact exists whether the Coroner's Office conduct amounted to intentional infliction of emotional distress.

Affirmed in part, reversed in part, and remanded for further proceedings.

NAJAM, J. and DARDEN, J. concur

22