In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-1501

JOHN DOE and A. B.,

*Plaintiffs-Appellants*,

*v.*

ADAM GRAY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:20-cv-00129-DRL — **Damon R. Leichty**, *Judge*.

ARGUED JANUARY 5, 2023 — DECIDED JULY 28, 2023

Before FLAUM, ROVNER, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. John Doe and A.B. were investigated and arrested for neglecting a dependent and failing to support a dependent child under Indiana law. After the charges were resolved with deferred prosecution agreements, together they sued a detective, the Starke County Sheriff's Department, and a case manager with the Indiana Department of Child Services. They brought claims under 42 U.S.C. § 1983 alleging violations of Doe's right to privacy in sexual

preference[1] under the Fourteenth Amendment and that they were arrested without probable cause contrary to the Fourth Amendment. They also brought a state law claim of intentional infliction of emotional distress.

After the defendants moved for summary judgment on the claims, the plaintiffs sought to amend their complaint to clarify that Doe's Fourteenth Amendment claim pertained to the disclosure of gender identity as opposed to sexual preference. The district court denied the motion to amend and granted summary judgment to the defendants. We affirm.

## I. Background

### A. Factual[2]

John Doe is a transgender male who was born female. He had breast-removal surgery but no other gender-altering procedure. Doe's significant other is A.B.,[3] the mother of R.M., J.M., K.B., and two other children.

Adam Gray, a detective with the Starke County Sheriff's Department, and Katherine Purtee, a family case manager with the Indiana Department of Child Services, met with seventeen-year-old R.M. to investigate allegations that Doe and A.B. had abandoned him. In that February 1, 2018 meeting, R.M. told Gray and Purtee that he had lived with his

---

[1] The plaintiffs in their complaint and pleadings employed the term "sexual preference" rather than the more widely used term "sexual orientation." We use the term as it was pleaded.

[2] The facts are relayed in the light most favorable to the non-movants, Doe and A.B. *See Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 668 (7th Cir. 2022).

[3] The record is unclear as to whether Doe and A.B. are legally married.

mother, A.B., and stepfather, Doe, since November 2017. A.B. and Doe found out that R.M. knew his sister J.M. had snuck out of the house one evening. As a result, around January 27, 2018, A.B. and Doe reportedly told R.M. to leave the home and not return. R.M. had been staying with his friend M.B. at Suzanne Brewer's home before then and remained with the Brewers after.

In the meeting with Gray and Purtee, R.M. told them about text messages he exchanged with A.B. In those messages A.B. told R.M. he could return home but was grounded. R.M. responded that he did not want to be grounded. He also said he had told his school he could not return home to avoid being charged as a runaway.

A week after the meeting, R.M. was brought to the Starke County Sheriff's Department for a recorded interview with Gray and Purtee. In that interview, R.M. reiterated that Doe had told him not to return home and to stay at M.B.'s house. R.M. also said neither A.B. nor Doe had given him money since he was kicked out and that A.B. had provided food on only one occasion. In addition, R.M. recalled that this was not the first time that he had been kicked out of the home. R.M.'s statements to Gray and Purtee also raised concern that Doe was sexually assaulting R.M.'s sisters.

Gray obtained a letter from Suzanne Brewer in which she confirmed that R.M. had stayed in her home. She stated A.B. had not called her about R.M. or stopped by to check on him, nor had A.B. provided money to support him. Brewer acknowledged that A.B. brought R.M. food on one occasion. Brewer also revealed that she had driven R.M. to his home on January 29, 2018 to pick up some of his belongings and that a bag of R.M.'s clothes was on the porch when they arrived.

After R.M.'s recorded interview, and based on his investigation, Gray contacted a prosecutor about possible charges against Doe and A.B. The prosecutor advised that probable cause of a crime existed. On February 7, 2018, Doe and A.B. were arrested for two Indiana offenses: neglect of a dependent under Indiana Code § 35-46-1-4(a)(3) and nonsupport of a dependent child under Indiana Code § 35-46-1-5(a).

The next day, Gray interviewed A.B. During that interview, the detective explained that allegations of sexual misconduct had been made against Doe. Gray told A.B. that K.B.'s birth certificate had been falsified to name Doe as the child's father. Gray also stated that Doe was born female, had previously been named Barbara B., and had female genitalia. A.B. claims not to have known that Doe has female genitalia until Gray revealed this fact in the interview.

After the arrests, Purtee took custody of the minor children for placement in foster or kinship care. Purtee spoke with April Hopkins, A.B.'s sister, about placing the children with her. During that phone conversation, Hopkins says Purtee disclosed that Doe was born female. While at the Brewers' home, Purtee also revealed that Doe was born female to Suzanne Brewer, M.B., J.M., and R.M.[4]

### B. Procedural

Doe and A.B. sued Gray and Purtee in their individual and official capacities, the Starke County Sheriff's Department, and the Indiana Department of Child Services under 42 U.S.C. § 1983. In a Fourteenth Amendment claim against Gray and

---

[4] Doe alleged that Purtee made the same disclosure to foster parent Tracy Patrick. This claim appears to have been abandoned at summary judgment, and even if it was not, our decision is unaffected.

Purtee, Doe alleged they violated his right to privacy by disclosing his "sexual preference." Doe and A.B. raised a Fourth Amendment violation against Gray, contending he lacked probable cause to arrest them. Doe also brought a state law claim of intentional infliction of emotional distress against Gray and Purtee. The Starke County Sheriff's Department and the Indiana Department of Child Services were named as defendants under a respondeat superior theory.[5]

The defendants moved for summary judgment on the remaining claims. Over one month later, the plaintiffs moved to amend their complaint. They sought to revise their Fourteenth Amendment claim by asserting a right to privacy in gender identity as opposed to sexual preference. After considering the claims with respect to both Doe's sexual preference and gender identity, the district court denied the plaintiffs' motion to amend and granted summary judgment to the defendants. The court concluded that Gray was entitled to qualified immunity on Doe's Fourteenth Amendment claim, and that Gray had probable cause for the arrests, precluding the Fourth Amendment claim. On the state law claim, Doe conceded in his response brief that Gray was entitled to immunity under the Indiana Tort Claims Act (ITCA) in his personal capacity. The district court also ruled that Gray was entitled to immunity under that statute in his official capacity. Gray's immunity under the ITCA relieved the Starke County Sheriff's Department of liability.

---

[5] Through a joint motion, all claims against the Indiana Department of Child Services and Purtee in her official capacity were dismissed with prejudice. The intentional infliction of emotional distress claim against Purtee in her individual capacity was also later dismissed.

## II. Discussion

Doe and A.B. raise three challenges on appeal:

- The defendants are not entitled to qualified immunity on Doe's Fourteenth Amendment claim because there was a clearly established right to privacy in one's sexual preference or gender identity at the time that information was disclosed;

- The text messages between A.B. and R.M. establish a genuine dispute of material fact as to whether Gray had probable cause to arrest Doe and A.B., precluding summary judgment on their Fourth Amendment claim; and

- Gray, in his official capacity, is not entitled to immunity under the ITCA because he was not adopting or enforcing state law in disclosing Doe's sexual preference or gender identity.[6]

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). This court reviews a district court's grant of summary judgment de novo, reading the facts and drawing all reasonable inferences in favor of the non-movant. *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023).

---

[6] Doe and A.B. also argue that the district court erred in denying leave to amend their complaint. Because we affirm the grant of summary judgment to the defendants, even in light of the proposed amendment, we need not address this argument.

### A. Fourteenth Amendment Claim

Doe argues he had a clearly established right to privacy in his sexual preference or gender identity, relying primarily on *Wolfe v. Schaefer*, 619 F.3d 782 (7th Cir. 2010), *Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000), and *Schaill ex rel. Kross v. Tippecanoe County School Corp.*, 864 F.2d 1309 (7th Cir. 1989), *amended*, Feb. 14, 1989. At oral argument, however, Doe's counsel admitted that at the time of the challenged conduct, no authority clearly established a right to withhold gender identity from a partner. Oral Arg. at 9:23–9:43, 10:28–10:30, 11:06–11:22. Even so, to Doe, there is a clear trend in the case law such that recognition of a right to privacy in one's sexual preference or gender identity was merely a matter of time.

The defendants respond that Doe has waived the issue by failing to engage with the district court's reasoning in his briefing. Even assuming the issue has not been waived, we hold that the defendants are entitled to qualified immunity. There was no clearly established right to privacy in one's sexual preference or gender identity during a criminal or child welfare investigation at the time of the underlying conduct, nor is there now.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017) (cleaned up) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). We assess claims of qualified immunity under a two-part test. *See id.* The plaintiff bears the burden of showing that (1) a statutory or constitutional right was violated and (2) that right was clearly established at the time of the relevant

conduct. *See id.* This court may address whether a right was clearly established before addressing whether the right was violated. *Id.* at 351.

"To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right … ." *Id.* (quoting *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015)). A plaintiff is not required to present an identical case concluding that the challenged conduct was unlawful, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). We first assess "controlling Supreme Court precedent and our own circuit decisions on the issue." *Id.* (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)). If there is no controlling Supreme Court precedent, "we broaden our survey to include all relevant caselaw in order to determine whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.* (cleaned up) (quoting *Jacobs*, 215 F.3d at 767). Allegedly violated rights must be defined at the appropriate level of specificity. *Id.* "[T]he dispositive question is whether the violative nature of the *particular* conduct is clearly established." *Id.* (cleaned up) (quoting *Mullenix*, 577 U.S. at 12).

A general recognition of a privacy right in certain medical or sexual information is not enough to show a more specific privacy right in one's sexual preference or gender identity during a criminal or child welfare investigation, especially one involving allegations of child sexual abuse. *Cf. Anderson v. Romero*, 72 F.3d 518, 523 (7th Cir. 1995) (observing that

evidence showing that the defendants "would have known that disclosing *some* medical records in *some* circumstances" was insufficient to show the asserted right was clearly established). The right to privacy in the disclosure of personal matters has its origins in *Whalen v. Roe*, 429 U.S. 589 (1977). The Supreme Court in *Whalen* addressed whether New York could, consistent with the Fourteenth Amendment, record the names and addresses of individuals who obtained certain drugs for which there was both a legal and illegal market. *Id.* at 591. In holding that the scheme did not "constitute an invasion of any right or liberty protected by the Fourteenth Amendment," the Court referred to an "individual interest in avoiding disclosure of personal matters." *Id.* at 599, 603–04.

This court has interpreted *Whalen* "to recognize a constitutional right to the privacy of medical, sexual, financial, and perhaps other categories of highly personal information … ." *Wolfe*, 619 F.3d at 785. In *Wolfe*, a former electoral candidate sued his opponent alleging he violated the Fourteenth Amendment by publicly disclosing that the candidate was under investigation for possible violations of Illinois law. *Id.* at 783. This court affirmed dismissal of the case, *id.* at 786, explaining that the Supreme Court's rejection of a liberty or property right in one's reputation cast doubt on the existence of a right to informational privacy premised on the protection of this information under state law. *See id.* at 785. Though this court in *Wolfe* acknowledged that it had interpreted *Whalen* to announce a right of informational privacy, *Wolfe* did not clearly establish a right to privacy in one's sexual preference or gender identity in the context presented here.

Nor did *Denius* or *Schaill* address the disclosure of similar information during a criminal or child welfare investigation.

In *Denius*, an employer conditioned renewal of an employer contract on consent to release certain confidential information. 209 F.3d at 948–49. An employee who refused to sign the authorization and whose employment contract was therefore not renewed asserted a violation of the Fourteenth Amendment. *Id.* at 949. This court held that "to the extent that the Authorization provided for the release of medical records or communications, [the employer] was on notice that this type of information has constitutional protection[,]" defeating qualified immunity. *Id.* at 956–57 (footnote omitted). But a reasonable official would not have understood, based on *Denius*, that the disclosure of one's sexual preference or gender identity during a criminal or child welfare investigation was unlawful. Similarly, *Schaill* recognized that the disclosure of a student-athlete's medical information in the event of a positive urine test may violate the right to privacy depending on the scope of the dissemination. 864 F.2d at 1322 n.19. Neither of these decisions implicated the disclosure of medical or otherwise confidential information during a criminal or child welfare investigation.

We also cannot say that controlling precedent makes evident that such a right is simply a question of time. *Kemp*, 877 F.3d at 351. The plaintiffs cite *Obergefell v. Hodges*, 576 U.S. 644 (2015), *United States v. Windsor*, 570 U.S. 744 (2013), and *Lawrence v. Texas*, 539 U.S. 558 (2003), but those decisions do not address any right to protect one's sexual preference or gender identity from disclosure during a criminal or child welfare investigation. We therefore agree with the district court's cogent reasoning on Doe's Fourteenth Amendment claim and its grant of summary judgment on this claim to the defendants.

**B. Fourth Amendment Claim**

The district court also granted summary judgment to Gray on the plaintiffs' Fourth Amendment claim, relying in part on the fact that Doe and A.B. never provided financial support to R.M. or Brewer. In the text messages between R.M. and A.B. the plaintiffs see a dispute of material fact about what Gray knew at the time of the arrest to establish probable cause. They also aver that given such material factual disputes, a qualified immunity determination is a jury issue.

The defendants respond that the plaintiffs have waived these arguments. On the merits, the defendants argue that even if Gray knew about some of the text messages, the totality of the circumstances still supported probable cause. Gray is otherwise entitled to qualified immunity, the defendants contend, because he relied on the advice of counsel in determining whether he had probable cause for the arrests.

Assuming Doe and A.B. have not waived their challenges, we first discuss probable cause, and then consider whether it exists under the factual circumstances here.

*Probable Cause*. Probable cause for an arrest serves as "an absolute defense to any § 1983 claim against a police officer for false arrest." *Braun v. Village of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (quoting *Jump v. Village of Shorewood*, 42 F.4th 782, 788 (7th Cir. 2022)). "Probable cause to arrest exists 'when the facts and circumstances that are known to [the officer] reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Id.* (quoting *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007)). It "deals with probabilities and depends on the totality of the circumstances." *District of Columbia v. Wesby*, 138 S. Ct.

577, 586 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). It "is not a high bar," *id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)), and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity[,]" *id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

"The existence of probable cause … depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law." *Abbott*, 705 F.3d at 715. By definition, an affirmative defense is not an element of the offense. *See Dollard v. Whisenand*, 946 F.3d 342, 355 (7th Cir. 2019). Although officers "may not ignore conclusively established evidence of the existence of an affirmative defense," the Fourth Amendment does not require them to investigate the validity of these defenses. *Id.* (cleaned up) (quoting *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009)).

*Neglect of a Dependent.* Under Indiana law, "[a] person having the care of a dependent, whether assumed voluntarily or because of a legal obligation," commits neglect of a dependent where he or she knowingly or intentionally "deprives the dependent of necessary support." IND. CODE § 35-46-1-4(a)(3).[7] "Support" under the statute is defined as "food, clothing, shelter, or medical care." IND. CODE § 35-46-1-1. The term "necessary support" as used in the provision means "essential, indispensable or absolutely required food, clothing, shelter and medical care; i.e., food, clothing, shelter, and medical care without which the dependent's life or health is at risk or endangered." *Ricketts v. State*, 598 N.E.2d 597, 600 (Ind. Ct.

---

[7] All citations to statutes are to those versions in effect at the time of the conduct leading to the arrests.

App. 1992). To deprive a dependent of support, a defendant "must have actively denied" the support and have "been aware of a high probability" that he or she was doing so. *Mallory v. State*, 563 N.E.2d 640, 643 (Ind. Ct. App. 1990). "A parent is charged with an affirmative duty to care for [a] child[,]" and "[t]he standard of care is what a reasonable parent would do or not do under the circumstances." *Id.* at 644.

The Indiana Court of Appeals has suggested that evidence supporting a neglect conviction may include that a child's diet subjected his or her health or life to a risk or danger that was actual or appreciable. In *Ricketts*, the Indiana Court of Appeals held that neglect convictions could not be sustained under the provision exclusively based on evidence that the defendant's children suffered from malnutrition. *Id.* at 601. That court observed that "there is a critical difference between malnutrition in the sense of poor nutrition and malnutrition which endangers or places at risk a dependent's health or life." *Id.* Since only the former was shown, the conviction was vacated. *See id.* at 601–02. But had the state "introduced evidence that the children's diet subjected their health or their lives to a risk or danger that was actual and appreciable," the outcome may have been different. *Id.* at 601 n.6.

Under the totality of the circumstances, Gray had probable cause to arrest Doe and A.B. for neglect of a dependent, despite the text messages. We focus our attention on the deprivation of necessary food as opposed to any alleged deprivation of necessary shelter. Gray knew from R.M.'s interview that Doe had allegedly told R.M. to stay at M.B.'s home. Likewise, Gray knew that A.B. had dropped off food for R.M. at the Brewer home. Doe and A.B. were therefore aware that R.M. was living with the Brewers. There is at least a genuine

issue of material fact as to whether a reasonable officer could have believed they knowingly deprived R.M. of shelter without which his life or health was at risk or endangered.

But there was a substantial probability that Doe and A.B. knowingly or intentionally deprived R.M. of necessary food. Deprivation turns on whether a reasonable officer could have concluded that R.M. was not allowed to return home. A victim's report need not be "unfailingly consistent to provide probable cause." *Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 1999). Although an officer should conduct further investigation if "information from or about a [putative] victim of crime would lead a reasonable officer to be suspicious," an officer "need not exclude every suggestion that a victim is not telling the truth." *Id.* at 724 (quoting *Hebron v. Touhy*, 18 F.3d 421, 422–23 (7th Cir. 1994)). Potential inconsistencies between R.M.'s testimony and the text messages did not require additional investigation or undermine probable cause. Gray knew that R.M. previously had been told not to return home, as well as that Brewer took R.M. to pick up a bag of his clothing left for him outside the home. A reasonable officer could have concluded from these facts that R.M. was not allowed to return home, despite text messages suggesting he voluntarily chose not to return.

A reasonable officer also could have concluded that R.M.'s health was endangered by being unable to obtain food from Doe and A.B.'s home. Doe and A.B. do not direct this court to any evidence Gray knew that R.M. was eating at the Brewer house. Nor is there evidence in the record that Doe ever asked R.M. if he had anything to eat, and A.B. only asked R.M. once whether he wanted food, to which he responded affirmatively. A.B. provided R.M. with food once over the course of

approximately eleven days. From these facts, Gray had probable cause believe that Doe and A.B. knew that they had deprived R.M. of necessary food, supporting their arrests for neglect of a dependent.

*Nonsupport of a Dependent Child.* An individual who "knowingly or intentionally fails to provide support to the person's dependent child" commits nonsupport of a dependent child under Indiana law. IND. CODE § 35-46-1-5(a). "Support" carries the same definition of "food, clothing, shelter, or medical care," as used in the provision for neglect of a dependent. *See* IND. CODE § 35-46-1-1. The provision for nonsupport of a dependent child also provides:

> It is a defense that the child had abandoned the home of the child's family without the consent of the child's parent or on the order of a court, but it is not a defense that the child had abandoned the home of the child's family if the cause of the child's leaving was the fault of the child's parent.

§ 35-46-1-5(b). Although Indiana courts have not decided this issue, Indiana Pattern Jury Instruction No. 7.0740 specifies that the defendant bears the burden of proof on this defense and that it does not negate any element of the crime. Therefore, unless the evidence conclusively established the defense, Gray need not have considered it when assessing probable cause. *See Dollard*, 946 F.3d at 355.

The totality of the circumstances also supports probable cause for the arrests for nonsupport of a dependent child. Doe and A.B. failed to provide R.M. with food while he was out of their home, except on one occasion. Moreover, the evidence

did not conclusively establish the affirmative defense that R.M. abandoned the home. This is because R.M. alleged that he had been kicked out of the home previously and on the occasion, and Brewer stated that she had driven R.M. to pick up a bag of clothes that had been left for him on the porch. Gray therefore had probable cause to support arrests for non-support of a dependent child.[8] Because there was probable cause for the arrests, we need not address qualified immunity.[9]

### C. State Law Claim

The district court ruled that Gray was immune from suit in his official capacity under the ITCA on Doe's intentional infliction of emotional distress claim. Doe challenges this ruling, contending that Gray was not adopting or enforcing a law when he disclosed Doe's sexual preference or gender identity. Even assuming the argument has not been waived, we affirm the district court.

Indiana Code § 34-13-3-3(8)(A) provides that a tort claim may not be brought against a public employee "acting within the scope of the employee's employment" if the loss results from "[t]he adoption and enforcement of … a law." Indiana courts have defined "enforcement" to mean "compelling or

---

[8] In assessing probable cause for both offenses, the district court need not have considered whether Doe and A.B. provided financial support to R.M. or Brewer. Neither offense defines "support" as including money. *See* IND. CODE § 35-46-1-1; *see also Geans v. State*, 623 N.E.2d 435, 437 (Ind. Ct. App. 1993).

[9] Any argument that may have been available under *Heck v. Humphrey*, 512 U.S. 477 (1994), related to the Fourth Amendment claim has been waived.

attempting to compel the obedience of another to laws, rules, or regulations, and the sanctioning or attempt to sanction a violation thereof." *Johnson ex rel. Ind. Dep't of Child Servs. v. Marion Cnty. Coroner's Office*, 971 N.E.2d 151, 158 (Ind. Ct. App. 2012) (quoting *St. Joseph Cnty. Police Dep't v. Shumaker*, 812 N.E.2d 1143, 1150 (Ind. Ct. App. 2004)). "An employee's scope of employment consists of activities involving the pursuit of the governmental entity's purpose." *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 483 (Ind. 2003). Thus, Indiana courts have specified that "a governmental entity will be immune only for adopting or enforcing … a law, rule, or regulation within the scope of the entity's purpose or operational power." *Johnson*, 971 N.E.2d at 158 (quoting *Shumaker*, 812 N.E.2d at 1150).

We understand Doe's concession in the district court—that Gray was entitled to immunity under the ITCA in his individual capacity—to mean there is no dispute that Gray acted within the scope of his employment. *See* IND. CODE § 34-13-3-5(a). So, we address only whether Gray was enforcing a law within the scope of the Starke County Sheriff's Department's purpose or operational power.

Arrestee interviews are within the scope of the Starke County's Sheriff's Department's operational power. *See* IND. CODE § 36-8-10-9(a)(1), (2) (providing that each member of the sheriff's department has "general police powers" and shall detain offenders "until the cause of the arrest has been investigated"). The transcript of Gray's interview with A.B. reveals that he disclosed information about Doe in the context of informing her that federal officers would be investigating the falsification of K.B.'s birth certificate. Even if enforcing federal law was not within the scope of the Starke County Sheriff's Department's operational power, this information was also

related to the state investigation of alleged neglect and non-support as well as possible child sexual abuse of a dependent child. As part of that investigation, Doe and A.B.'s children would be placed with other individuals. Gray told A.B. during the interview that the children's placement needed to be reevaluated, which was why he needed to speak with A.B. For purposes of child placement, therefore, it was relevant to identify K.B.'s father. Gray thus provided information about Doe to A.B. while enforcing state law within the scope of the Starke County Sheriff's Department's operational power. Gray is entitled to immunity under the ITCA. Accordingly, the Starke County Sheriff's Department is also immune from the plaintiffs' state law claim. *See Minks v. Pina*, 709 N.E.2d 379, 382 (Ind. Ct. App. 1999).

### III. Conclusion

The defendants are entitled to qualified immunity, as there is no clearly established right to privacy in one's sexual preference or gender identity during a criminal or child welfare investigation. The totality of the circumstances provided probable cause for the arrests of Doe and A.B., and the Indiana Tort Claims Act provides Gray immunity from plaintiffs' Indiana intentional infliction of emotional distress claim. For these reasons, we AFFIRM.